Court of Appeals Number: 04-14-00687-CV
Trial Court Case Number: 2014-CI-05034

| | |
|---|---|
| Rudy Neira<br>Appellant, Pro Se<br><br>V.<br><br>Sheryl Scully, in her official capacity as the City Manager<br>of the City of San Antonio(City) on behalf of San Antonio<br>Planning Commission, Appellee and<br><br><br>Richard Hovenden,<br>Interested Party | § IN COURT<br>§ OF APPEALS<br>§ Fourth Court of Appeals<br>§ District<br>§<br>§<br>§<br>§ BEXAR COUNTY<br>§ TEXAS<br>§<br>§<br>§<br>§ |

## APPELLANT'S BRIEF

**Introduction**

This brief is in reply to the recent January 23, 2015 Order from the Fourth Court of Appeals. (Court of Appeals) The January 23, 2015 Order states that the Court of Appeal takes jurisdiction over above styed cause, and, requests a Brief within thirty (30) days after the date of the January 23, 2015 Order.

The Court of Appeals may disregard Appellant's prior brief, filed with the Court of Appeals prematurely on October 1, 2014.

Appellant uses Texas Rules of Appellate Procedure for this brief and for filing procedures. The following summary information is provided in order to comply with these rules:

Rule 25 Notice of Appeal
    (1) On appeal from 37th Judicial District Court of Bexar County, Texas, Trial Court Cause No. 2014-CI-05034
    (2) Date of summary judgment being appealed: September 14, 2014
    (3) Party desires to appeal: Mr. Rudy Neira
    (4) Court to which appeal is taken: Fourth Court of Appeals

Rule 34.5 Clerk's Record

a. Contents. Unless the parties designate the filings in the appellate record by agreement under Rule 34.2, the record must include copies of the following:

1. In civil cases, all pleadings on which the trial was held: A summary judgment hearing was held on September 12, 2014 and a one-page summary judgment order was signed by the judge on September 14, 2014. The Clerk's Record should include the City's request for summary judgment titled "Defendant Sheryl Sculley's Motion for Summary Judgment"; and, consisting of an 18-page brief and a 93-page attachment. The Clerk's Record should also include an August 28, 2014, reply by Mr. Neira, titled "Plaintiff's Response to Defendant's Summary Judgment and Motion for Summary Judgment in Favor of Plaintiff" and consisting of a 6-page brief and a 20-page attachment. A court reporter was not at the September 12, 2014 hearing and oral pleadings are not available.

2. The court's judgment or other order that is being appealed- See Summary judgment order signed by the presiding judge on September 14, 2014.

3. Any request for preparation of the clerk's record- this document serves as appellant's request. Appellant's request is in item 1 above.

# Appellant's Brief

The following is Appellant's brief in the format of Rule 38 of Texas Rules of Appellate Procedure. Rule 38 is titled "Requisite of Briefs.

| Table of Contents | Page |
|---|---|
| (a) Identity of Parties and Counsel | 3 |
| (b) Table of Contents | 2 |
| (c) Index of Authorities | 3 |
| (d) Statement of Case | 3 |
| (e) Any Statement Regarding Oral Argument | 4 |
| (f) Issues Presented | 4 |
| (g) Statement of Facts | 4 |
| (h) Summary of Argument | 6 |
| (i) Argument | 6 |
| (j) Prayer | 8 |
| See page 9 for Appendix (k and l) | |

**(a)Identify of Parties and Counsel**

Appellant:
Mr. Neira, Pro Se (Mr. Neira had no counsel at trail and has no counsel as appellant.)
210 5643634

Appellee's Counsel:
Fitzpatrick & Kosanovich, PC (Counsel for defendant at trail for Appellee)
PO Box 831121
San Antonio, TX 78283-1121      210 408-6793

Appellee:
Sheryl Scully, in her official capacity as the City Manager
of the City of San Antonio (City) on behalf of San Antonio
Planning Commission

Richard Hovenden,  (Interested Party has no counsel of record)
3019 Knight Robin Dr.
San Antonio, TX 78209 (located next door east of 3015 Knight Robin Dr.)

**(c)Index of Authorities**

Potter v. Clear Channel Outdoors, Inc. (Tex. App.-Houston (1st Dist.) Jul. 2, 2009)(Taft).
See Appendix (1) for a 23-page copy of this authority.

**(d) Statement of the Case (Pursuant rule 38.1)**

This case is an appeal by Appellant, Mr. Neira, of a summary judgment filed by the City.

On March 28, 2014, Mr. Neira, filed this suit in District Court pursuant Chapter 37 Declaratory Judgment of the Texas Civil Practice and Remedies Code asking the trial court to interpret Section 35-515(h)(1) of City ordinance to settle a controversy. There is no claim by Appellant of damages.

On September 14, 2014 the trial court rendered a summary judgment in favor of the City.

On January 23, 2015, the Court of Appeals issued an order accepting this jurisdiction of this case and requesting Appellant's reply within 30 days.

**(e) Statement Regarding Oral Argument**

Appellant does not request time for an oral argument, but is available if the Court of Appeals or the Appellee requests an oral argument.

Appellant's (Neira's) Brief

**(f) Issues Presented**

The primary issue is that the trial court erred because The Declaratory Judgments Act prohibits a summary judgment if there is "real and substantial controversy that can be settled by a declaratory judgment". Controversy exists because the City, in its October 7, 2013 letter, argues that replat of 3019 Knight Robin is valid based on the City's interpretation of Section 35-515(h)(1) of City ordinance. See October 7, 2013 City letter, in appendix in this Appeal, or, as exhibit 2 in Mr. Neira's original petition. Mr. Neira argues that the replat is not valid, based on his interpretation of Section 35-515(h)(1).

Another issue is that the trial court erred in its September 14, 2014 summary judgment because interpretation of Section 35-515(h)(1) of City Ordinance an issue of material fact, especially if Mr. Neira had requested a trial by jury. The evidence is Section 35-515(h)(1) of City ordinance.

Another issue is protecting public interest. Appellant strongly believes that proper interpretation of Section 35-515(h)(1) of City Ordinance will protect home owners throughout the city of San Antonio, especially from water diversion damage and invasion of back-yard privacy. Long drive ways of flag-lots create car traffic in neighbors' back yards, which previously, had privacy. Proper interpretation by the City of its City Ordinances will help promote government integrity. For example, a September 20, 2013 Express-News article described indictment of a former official of the City's Planning and Development Services Department for running a business that sold expedited building permits. Proper interpretation of City Ordinances by City officials will simplify replat and building permit applications and reduce the need for expedited services.

**(g) Statement of Facts (in chronological order)**

In the middle of May 2013, Mr. Neira received a City notice titled "Notice of Pubic Hearing by the San Antonio Planning Commission" (See Appendix for a copy). Mr. Neira telephoned Ms. Donna Camacho, who was listed on the notice, to ask if his testimony at the May 22, 2013 public hearing would influence the May 22, 2013 replat decision. Mr. Neira was told that his appearance at the hearing would not change the decision and therefore, Mr. Neira did not attend. Mr. Neira reviewed the replat of 3019 Knight Robin, which was attached to the notice of public hearing on May 22, 2013. He became concerned about reduction of privacy in his back yard and in potential flooding in his back yard and in the neighborhood. Mr. Neira had had flooding of his house and is familiar with flooding in his neighborhood. Mr. Neira noticed that the new replat of 3019 Knight Robin allowed for two new homes in the back yard of the existing home at 3019 Knight Robin. Two new homes in the back yard of the original lot at 3019 Knight Robin would have access to the street (Knight Robin Drive) with 20-foot drive ways. Mr. Neira is aware of zoning requirements, such as 40-foot minimum street frontage in most neighborhoods in San Antonio.

On August 1, 2013, Mr. Neira visited the City's over-the-counter service office at 1901 S. Alamo Street to ask about City zoning for his neighborhood. The City over-the-counter person was surprised when Mr. Neira mentioned that his neighbor at 3019 Knight Robin was able to replat his one-acre lot into lots that included 20-foot street frontage lots. The City over-the-counter person gave Mr. Neira a copy of zoning ordinance section 35-353, **which requires 40-foot minimum street frontage for new lots in replats** in Mr. Neira's neighborhood. She also gave Mr. Neira a copy of a new City ordinance, section 35-515, which allows back yard lots (flag lots) under certain conditions. Mr. Neira read the new section 35-515 City ordinance and concluded that if certain conditions are not met, flag lots (back yard lots) must be approved by at a City variance board in order to be valid. The lot at 3019 Kinght Robin was replatted without a variance board hearing.

On March 28, 2014, Mr. Neira filed "Plaintiff's Original Petition for Declaratory Judgment" asking that the trial court declare the Planning Commission's May 22, 2013 replat of 3019 Knight Robin invalid, based on the Court's interpretation of Section 35-515(h)(1)of City ordinance, and based on no variance board hearing being held.

The City filed motions for discovery and Mr. Neira replied.

On or about August 14, 2014, the City's attorney filed a motion for summary judgment arguing that Mr. Neira did not raise a genuine issue of material fact and that Mr. Neira did not provide evidence, along with other claims. The City's request for summary judgment is titled "Defendant Sheryl Sculley's Motion for Summary Judgment"; and, consists of an 18-page brief and a 93-page attachment.

On August 28, 2014, Mr. Neira filed a reply to the City's request for summary judgment. Mr. Neira's reply is titled "Plaintiff's Response to Defendant's Summary Judgment and Motion for Summary Judgment in Favor of Plaintiff". Mr. Neira's reply consists of a 6-page brief and a 20-page attachment.

On page 2 of his reply, Mr. Neira states as follows: There is real and substantial controversy that can be settled by a declaratory judgment."

On page 6, Mr. Neira states as follows:
"If the court agrees that Section 35-515(h)(1) of City ordinance is an exception that was not met, and, that flag lots are not allowed, then Plaintiff requests (prays) that the Court declare the following:

1. That the City of San Antonio's May 22, 2013 replat of 3019 Knight Robin is void and judicially invalid because the replat allows for flag lots and the replat does not meet statutory requirements of Section 212 of the Local Government Code.

As evidence, Mr. Neira's reply included an 11-page copy of Section 35.515 of City Ordinance. The 11-page copy is titled Exhibit 4 in Mr. Neira's reply to summary judgment.

On September 12, 2014, Mr. Neira and the City's attorney attended a summary judgment hearing. On September 14, 2014 the presiding judge signed a summary judgment in favor of the City.

On January 23, 2015 the Court of Appeals requested a Brief within thirty (30) days after the date of the January 23, 2015 Order.

With this "Appellant's Brief", Mr. Neira appeals the September 14, 2014 summary judgment decision.

## (h) Summary of Argument

Appellant argued in his original petition before the trial court, and, Appellant still argues with this appeal, that a substantial issue of controversy exists that can be settled with the Uniform Declaratory Judgments Act. The trial court erred because The Declaratory Judgments Act prohibits a summary judgment if there is real and substantial controversy that can be settled by a declaratory judgment. Controversy exists because the City argues that replat of 3019 Knight Robin is valid based on its interpretation of Section 35-515(h)(1) of City ordinance. Mr. Neira argues that the replat is not valid, based on his interpretation of Section 35-515(h)(1).

The City argued with its summary judgment that Mr. Neira did not raise an issue of material fact and that Mr. Neira did not provide evidence. To this, Mr. Neira argues that interpretation of Section 35-515(h)(1) is an issue of fact, especially if Mr. Neira had requested a trial by jury. Section 35-515(h)(1) is the evidence.

## (i) Argument

On March 28, 2014, Mr. Neira filed his suit under Section 37.004 Declaratory Judgments of Civil Practices and Remedies Code (Uniform Declaratory Judgments Act). The Declaratory Judgments Act provides for a trial on merits for Mr. Neira's claim that the replat of 3019 Knight Robin is invalid. Declaration of rights under Section 37.004 include rights under "municipal ordinance".

On or about August 14, 2014, the City's attorney filed a motion for summary judgment arguing that Mr. Neira did not raise a genuine issue of material fact and that Mr. Neira did not provide sufficient evidence, along with other claims.

On August 28, 2014, Mr. Neira filed a reply to the City's request for summary judgment.

In his reply, Mr. Neira states that there is real and substantial controversy that can be settled by a declaratory judgment. The City argues that the replat of 3019 Knight Robin is valid based on its interpretation of Section 35-515(h)(1) of City ordinance. Mr. Neira argues that the replat is not valid, based on his interpretation of Section 35-515(h)(1). Mr. Neira argues that the replat is not valid because it does not meet either of the two exceptions in Section 35-515. Mr. Neira argues that in order for the lot at 3019 Knight Robin to qualify for replat under Section 35-515(h)(1), the lot at 3019 Knight Robin must have been a lot with physical limitations or must have been a site with physical limitation. Mr. Neira argues that 3019 Knight Robin did have a physical limitation and did not qualify for flag lots without a variance hearing. Since no variance board hearing was held, any new lot at 3019 Knight Robin must comply with the 40-foot minimum street frontage of normal zoning in section 35-353 of City ordinance.

In his reply to summary judgment, Mr. Neira states as follows:
*"If the court agrees that Section 35-515(h)(1) of City ordinance is an exception that was not met, and, that flag lots are not allowed, then Plaintiff requests (prays) that the Court declare the following:*

1. *That the City of San Antonio's May 22, 2013 replat of 3019 Knight Robin is void and judicially invalid because the replat allows for flag lots and the replat does not meet statutory requirements of Section 212 of the Local Government Code."*

Larry E Potter, Appellant v. Clear Channel Outdoor, Inc, Appellee is relevant in this case. In the Larry Potter case, the Court of Appeals for the First District in Texas interpreted a contract to determine if a summary judgment rendered by the trial court was in error. The Court of Appeals for the First District in Texas determined that the trial court erred in its interpretation of the contract, and remanded the case to the trial court. The appeal court states in part. *"We remand this cause to the trial court with instructions to render a declaratory judgment in favor of Potter consistent with this opinion and to consider Potter's request for the award of attorney's fees and cost under Texas Civil Practice and Remedies Code section 37.009."*

If the Court of Appeals reads Section 35-515(h)(1) of City ordinance and agrees with Mr. Neira, that exceptions in this section are not met for the "automatic" replat of 3019 Knight Robin, then a City Variance Board hearing is required. The replat then is invalid because a variance board hearing was not held within the required time. An unlawful plat or replat is violation of Section 212.010(4) of Texas Local Government Code.

## (j) Prayer

Mr. Neira asks that the Appeal Court render a declaratory judgment in favor of Mr. Neira-that the May 22, 2013 replat of 3019 Knight Robin is invalid because Section 35-

Appellant's (Neira's) Brief

515 of City ordinance does not allow the replat without a timely City Variance Board hearing, and a City Variance Board hearing was not held. The City is in violation of Section 212.010(4) of Texas Local Government Code.

As an alternative, Mr. Neira asks the Court of Appeals remand this case for a trial court decision on Mr. Neira's request for declaratory judgment.

**Mr. Neira' Affidavit**

Mr. Neira is the Plaintiff, pro se, and makes this affidavit that he is competent to testify in this case, that he has personal knowledge of this case, that he is over age 18, and, that his statements above are correct to the best of his knowledge.

**Certificate of Service**

Mr. Neira certifies that his above-titled Notice was served by regular mail and by certified mail to the Appellee's attorney and to co Appellee, Mr. Hovenden as listed below:

Fitzpatrick & Kosanovich, PC (Attorney for Appellee)
PO Box 831121
San Antonio, TX 78283-1121

Richard Hovenden, (prior defendant)
3019 Knight Robin Dr.
San Antonio, TX 78209
(3019 Knight Robin Dr. is located next door east of 3015 Knight Robin Dr.)

On this the ___11th___ day of ___February___, 2015

_Rudy Neira_                    _Feb 11, 2015_
Rudy Neira, Appellant, Pro Se        Date
210 564-3634 office

Appellant's Brief Respectfully Submitted,

_Rudy Neira_                    _Feb 11, 2015_
Rudy Neira, Appellant, Pro Se        Date:
3015 Knight Robin Dr.
San Antonio, TX 78209          210 564-3634 office

Appellant's (Neira's) Brief

| | |
|---|---|
| **(k)** Appendix in Civil Cases | |
| **(l)** Necessary contents | |
| (A)Trial court's judgment: one page | 1 page |
| (B) Jury charge, conclusion of law: not applicable | Non jury |
| (C) The text of any rule, regulation, ordinance, statute, constitutional provision, or other law (excluding case law) on which the argument is based, and the text of any contract or other document that is central to the argument: | |
| (1) October 7, 2013 city letter central to the argument | 1 page |
| (2) May 22, 2013 Notice of Public Hearing by City Planning Commission | 2 pages |
| (3) City ordinance section 35-515 (h) | 11 pages |
| (4) City ordinance section 35-353 | 2 pages |
| (5) Chapter 37 Declaratory Judgments | 4 pages |
| (6) Potter v. Clear Channel Outdoors, Inc. (Tex. App.-Houston (1st Dist.) Jul. 2, 2009)(Taft) | 23 pages |



2014CI05034 -D037

Cause No. 2014-CI-05034

| RUDY NEIRA | § | IN THE DISTRICT COURT |
|---|---|---|
| | § | |
| v. | § | |
| | § | |
| SHERYL SCULLEY, IN HER OFFICIAL | § | |
| CAPACITY AS THE CITY MANAGER | § | 37th JUDICIAL DISTRICT |
| OF THE CITY OF SAN ANTONIO | § | |
| (CITY) ON BEHALF OF SAN ANTONIO | § | |
| PLANNING COMMISSION, AND | § | |
| RICHARD HOVENDEN, AS OWNER | § | |
| OF HOME AT 3019 KNIGHT ROBIN | § | BEXAR COUNTY TEXAS |

## ORDER GRANTING
## TO DEFENDANT SHERYL SCULLEY'S
## MOTION FOR SUMMARY JUDGMENT

Came on to be heard Defendant Sheryl Sculley's Motion for Summary Judgment against Plaintiff's claims and Plaintiff's Motion for Summary Judgment in support of his claims. Defendant Sculley appeared through counsel and Plaintiff appeared *pro se*. The parties presented their respective motions and responses, and the Court, after careful consideration of same, concludes that Defendant Sculley's Motion for Summary Judgment should be granted and Plaintiff's Motion for Summary Judgment be denied.

It is, therefore, ordered, adjudged and decreed, that Defendant Sheryl Sculley's Motion for Summary Judgment is hereby GRANTED, and all relief sought against her by Plaintiff is denied, and all claims made or that could have been made arising out of the nexus of fact underlying Plaintiff's allegations are hereby DISMISSED, with prejudice.

It is further ordered that Plaintiff's Motion for Summary Judgment is hereby DENIED.

This order is intended to be a final, dispositive, appealable order resolving all claims and controversies among the parties.

Signed on this the 14 day of September, 2014.

DISTRICT JUDGE, BEXAR COUNTY, TEXAS



**CITY OF SAN ANTONIO**
**DEVELOPMENT SERVICES DEPARTMENT**

October 7, 2013

Mr. Rudy Neira
3015 Knight Robin
San Antonio, Texas 78209

**RE: Plat No. 130191 Knight Robin**

Dear Mr. Neira:

Thank you for your letters dated August 21, 2013 and October 1, 2013. Please know that staff attempted to contact you by phone on August 29, 2013 and September 3, 2013. However, we were unable to reach you or leave a message for a return call. Eventually, on October 3, 2013 staff did reach you to discuss your concerns regarding the platted property.

As you are aware, the Development Services Department reviewed your letters and appreciates your concerns for your neighborhood. Staff re-evaluated the plat approved by the Planning Commission on May 22, 2013 and subsequently recorded at the Bexar County Courthouse on June 14, 2013. Please understand, this plat meets the development regulations of the Unified Development Code (UDC) and therefore, rescinding of the plat is not applicable.

As you stated in your letter, NP8 zoning requires a minimum lot frontage of 40 feet in accordance with UDC Section 35-353 *Neighborhood Preservation District*. However, the flag lot provision in the UDC, Section 35-515(h)(1) *Flag Lots*, specifically supersedes Section 35-353 and allows for reduced frontage for flag lots. Furthermore, the requirement for the applicant to seek a variance through the Board of Adjustments and Appeals was not applicable in this situation. Additionally, you point out that two additional lots on Vandiver were subdivided. Please be aware these lots also meet the standard of the provision noted above regarding flag lots.

Regarding the property located at 3011 Knight Robin, Section 35-371(b) of the UDC allows for the construction of an accessory dwelling structure on the property. Also, this property was created by the replatting of a portion of Lot 3 to establish Lot 17, consequently leaving a remaining portion of Lot 3. Since then, the remaining portion of Lot 3 was divided by metes and bounds survey and sold to two separate owners with the addresses of 3015 Knight Robin and 7214 Vandiver. State Law and the UDC require owners of lots created by survey, who require building permits in the future, be subject to replatting requirements in accordance with the UDC.

If you need further assistance regarding these issues, please do not hesitate to contact our office.

Sincerely,

John P. Jacks
Assistant Director

# NOTICE OF PUBLIC HEARING BY
# THE SAN ANTONIO PLANNING COMMISSION



## REPLAT # 130191 Knight Robin

The San Antonio Planning Commission will hold a public hearing at 2:00 p.m. on Wednesday, May 22, 2013, in the Board Room of the Cliff Morton Business and Development Services Center, 1901 South Alamo, for the purpose of considering a replat request within your subdivision. The applicant, Richard Hovenden, is proposing to replat Lot 8, NCB 11840, out of the Seidel Hills Subdivision plat, as recorded in Volume 4400, Page 5, in the deed and plat records of Bexar County, Texas. The site is located north of Knight Robin and east of N. Vandiver Road. The property is zoned NP-8 Neighborhood Preservation District.

PLEASE COMPLETE, SIGN AND RETURN THE ENCLOSED CARD PRIOR TO THE
CLOSE OF THE PUBLIC HEARING.

## Please note that as per State Law, the Planning Commission does not have the authority to deny a plat that meets all of the requirements of the Unified Development Code.

If the owners of 20 percent or more of the area in the preceding plat within 200 feet of the property proposed to be replatted file written protest with the Planning Commission, approval of the proposed replat shall require the favorable vote of at least three-fourths of the members present of the Planning Commission provided the replat involves a variance.

State law requires that the city provide a copy of Vernon's Texas Codes Annotated, Local Government Code Subsection 212.015 (c) to all property owners to be notified of a proposed replat. That Subsection reads as follows:

(c)  If the proposed replat requires a variance and is protested in accordance with this subsection, the proposed replat must receive, in order to be approved, the affirmative vote of at least three-fourths of the members present of the municipal planning commission or governing body, or both. For a legal protest, written instruments signed by the owners of at least 20 percent of the area of the lots or land immediately adjoining the area covered by the proposed replat and extending 200 feet from that area, but within the original subdivision, must be filed with the municipal planning commission or governing body, or both, prior to the close of the public hearing.

The Cliff Morton Business and Development Services Center is wheelchair accessible. Accessible parking spaces are located at the south and north side of the building. Auxiliary aids and services are available upon request. Interpreters for the deaf must be requested 48 hours prior to the meeting, call 207-7245 Voice/TDD for assistance. **For further information on this item, please call Donna Camacho of the Land Entitlements Section of the Development Services Department at (210) 207-5016.**

*1 of 2 Notice of 5-22-13 hearing*



REPLAT AND SUBDIVISION PLAT
ESTABLISHING
**KNIGHT ROBIN**

ESTABLISHING LOT 24, BLOCK 4, LOT 25, BLOCK 4, AND LOT 26, BLOCK 4, KNIGHT ROBIN, 1.066 ACRES OF LAND IN NEW CITY BLOCK 11840, BEXAR COUNTY, TEXAS, RECORDED IN VOLUME 4400, PAGE 5, IN THE DEED AND PLAT RECORDS, BEXAR COUNTY, TEXAS.

SCALE 1" = 60'

DATE: APRIL 2013

**CEC**

Civil Engineering Consultants
JOB NUMBER: 03437500

DULY AUTHORIZED AGENT

LOCATION MAP
NOT TO SCALE

SITE

## DIVISION 4. LOT LAYOUT, HEIGHT, AND DENSITY/INTENSITY STANDARDS

Sec. 35-515. Lot Layout Regulations.
Sec. 35-516. Setback and Frontage Regulations.
Sec. 35-517. Building Height Regulations.
Secs. 35-518 to 35-520. Reserved.

### Sec. 35-515. Lot Layout Regulations.

*STATEMENT OF PURPOSE*

*This section provides for blocks which provide a pedestrian scale, offer alternative paths for vehicular traffic, and which accommodate on-street parking. Standards are provided to ensure that lots have adequate access and conform to the zoning provisions of this chapter. The city finds and determines that long blocks lined with homes and other buildings reduce street connectivity and impair the efficiency of public and safety services, while increasing distances between residences and nonresidential destinations or public gathering places. Exceptions to these standards are made for non-urban districts and zoning districts (such as "RP" and "RE") and districts which require greater flexibility in order to encourage economic development (such as "I-1" and "I-2").*

*1 of 11.*
*Section 35-515*



## Interior blocks (2 tiers required)

## Blocks adjoin Collector (1 ti

**LOCAL STREET**

**LOCAL STREET**

(a)     **Buildings to be on a Lot.** Except as permitted in the planned unit development district, every building shall be located on a lot. In the "RP" and residential zoning districts, no more than one (1) principal building may erected on a lot unless otherwise permitted in this chapter.

(1)     **Building on or Near Common Property Line.** Construction on or near a common property line of two (2) or more retail/service uses may be permitted after complying with all other provisions of this chapter and then current building codes subject to recording in the Bexar County Deed Records an operational easement agreement (OEA) which provides for each of the provisions as follows:

A.     Provision of a written description of the responsibilities, limitations, and liabilities of the arrangement between the separate property owners that allows for the individual building be considered as a single building group (when viewed together).

B.     Specifies that the owners of the separate property in the proposed building group agree to maintain a maximum one (1) story, fully sprinkled building group, with a sixty-foot yard on all sides (when viewed as a group).

C.     Notes that where a lot line passes through the building group, either an area separation wall of four (4) hours fire-resistive construction or two (2) two-hour area separation walls will be constructed. These firewalls will limit the potential fire exposure of each owner's portion of the common structure.

D.     Notes that a sixty-foot yard may be provided by a platted "No Build" easement adjacent to the building or building group.

E.     The OEA is in perpetuity, is irrevocable without the city's written authorization, is signed by each property owner, is recorded in the Bexar County Deed Records and so noted on each plat of the participating properties.

(2)     **Building on or Near Common Property Line (Single-Family Use Only).**

*The current adopted International Building Code and International Residential Code do not provide for building over common property lines without appropriate fire rated walls, projections, openings and penetrations (for the purpose of this section a "common property line" shall refer to any property line between multiple platted lots under the same ownership as indicated in the property records of Bexar County, Texas). The strict interpretation of such a provision adversely impacts the single-family housing market and specifically inner-city areas which were developed with lots as narrow as twenty-five (25) feet in width. Therefore, the cost of rectifying common property lines by an amending plat unfairly impacts housing cost, especially on inner-city lots.*

A.     A single-family structure, addition, or accessory structure (excluding accessory dwellings) may be built over a common property line if each and all of the following conditions are met:

1.     All of the subject lots shall be under ownership of a single person, partnership, corporation of other recognized legal entity.

2.     The building, addition, or accessory structure to be constructed is for single-family use and no other use.

3.     The lots must be platted unless the property is located in the original 36-square mile area of San Antonio, and the boundaries of the lots were recorded in the Deed and Property Records of Bexar County prior to June 14, 1927. It shall be the obligation of the applicant to provide documentation of the lots' platting or recording prior to June 14, 1927.

4.     The side and rear setbacks of the structure in question shall be no less than that required in section 35-310 table 310-1.

5.     All of the lots in question are within one of the following single-family zoning districts: FR, RP, RE, RD, R-20, NP-15, NP-10, NP-8, R-6, R-5, R-4 or R-3.

6.     Prior to receiving a building permit the owner shall obtain a certificate of

determination from the department of planning and development services that the above five (5) conditions have been met. In addition if the subject property is in a historic district and/or neighborhood conservation district the director of planning and development services must make a finding of compliance and compatibility with the provisions of the applicable historic and/or neighborhood conservation district prior to issuance of a building permit.

B.    A building may not be built over a common lot line under any of the following conditions:

1.    A structure built over a common property line may not be built and/or converted for other than single-family use and

2.    Under no conditions shall a duplex, tri-plex, four plex or any other multi-family dwellings be permitted without rezoning and platting.

C.    An owner may remove a common property line by filing an amending plat per the regulations of section 35-441

(b)    **Blocks.**

(1)    **Lots to Be Contiguous.** Lots shall be arranged in a contiguous pattern within blocks, or adjoining a cul-de-sac. For minor subdivisions, all lots shall be contiguous, and any new lots subdivided from a tract which has been previously subdivided shall adjoin the existing lots.

(2)    **Block Width.** Blocks to the interior of the subdivision shall have sufficient width to provide for two (2) tiers of lots. One (1) tier of required block width shall be permitted in blocks adjacent to collector or arterial streets or waterways. Not more than two (2) tiers of lots shall be provided for any block. The provisions of this subsection do not apply to flag lots permitted by subsection (h), below.

(3)    **Block and Street Length.**

A.    **Block Length.** The length of a block where homes front a street within a subdivision or site plan shall be measured from the edge of the property line of the street siding the furthest lot of the block width or to the center of a cul-de-sac, 90° Elbow, or 90° Knuckle.

(i)    A street's block length shall not exceed seven hundred (700) feet when the street is a:

• Local type B (with houses fronting),

• Local type A which serves as an entrance street to the proposed neighborhood, or

• Part of a TND use pattern (see subsection 35-207(f)).

(ii)    A street's block length shall not exceed one thousand two hundred (1,200) feet when the street is a:

• Block that ends with a cul-de-sac

• Local type A

(iii)    Block lengths do not apply to the following unless they transition into a street with houses fronting:

• Local type B

• Collectors or avenues

• Secondary arterials or main streets

• Primary arterials or boulevards

• Freeways or parkways

B.    **Street Length.** The maximum overall length of streets with homes fronting shall not exceed three thousand (3,000) feet. The overall street length shall be measured from the center of the two furthest intersecting streets or from its

intersection with a higher tier street whichever is less. There is no limit to the street length of a street without home fronting.

C.     Maximum street or block lengths, except subsection 35-515(b)(3)(A)(i), may be exceeded in accordance with subsection 35-506(t) of this chapter.

(c)     **Lots.**

(1)     **Compliance With Zoning District Regulations.** For proposed subdivisions within the incorporated area of the city, the size, width, depth, shape, and orientation of lots shall comply with the applicable zoning district regulations.

(2)     **Factors Governing Dimensions.** The size, width, depth, shape, and orientation of lots shall:

• Provide adequate building sites suitable to the special needs of the type of use contemplated.

• Accommodate lots of the size and dimensions required by articles II and III of this chapter.

• Provide for convenient access, circulation, control and safety of street traffic.

• Give due regard to the limitations and opportunities of topography.

(3)     **Minimum Lot Size in City Limits.** Within the incorporated areas of the city, minimum lot size shall conform to the requirements of article III, section 35-310

(4)     **Frontage.** All lots shall front on a public or private street or platted irrevocable ingress/egress easement and shall have a minimum frontage width as indicated in section 35-310. Where a platted irrevocable ingress/egress easement is utilized for frontage, the private street provisions of section 35-506 for street name and design standards shall be met. Neither the use of an irrevocable ingress/egress easement nor use of a private street shall be allowed to satisfy the major thoroughfare plan requirements. Frontage of a lot shall be determined by the property line of the lot adjacent to the right-of-way of the street upon which the property's address is based. On irregular shaped lots, a minimum street frontage of fifteen (15) feet shall be required. Single-family residential lots shall not front on a collector street, arterial street, or parkway except as specified under subsection 35-506(r)(2). An "irregular shaped lot" includes any lot located on a cul-de-sac or adjoining a curved section of a roadway with a centerline radius of less than two hundred (200) feet.

(5)     **Access.** Vehicular access to nonresidential uses must be by public street, private street, or an irrevocable ingress/egress easement as specified under subsection 35-515(c)(4) and shall not utilize any property that is zoned single-family residential. However, pedestrian access may be provided by means of a dedicated easement or access way to promote pedestrian circulation on residentially zoned property and/or by means of a public or private street.

(6)     **Prohibition Against Creating Landlocked Conditions.** Plat applicants shall ensure that there is no abutting landlock conditions created by the proposed plat.

(d)     **Driveways.** Restrictions on driveway areas are designed to avoid the domination of front yards by large expanses of impervious surfaces which deaden the streetscape and discourage pedestrian activity. Reducing the width of driveways can reduce total site imperviousness. Some techniques that can be used include:

(1)     Driveways and other impervious surfaces shall not comprise more than the percentage of the front yard as specified in column (B) for the use patterns or zoning districts designated in column (A). Driveway entrances shall not comprise more than the percentage of the front lot line as designated in column (B). Parking may be provided in the rear yard, and access may be provided through alleys, where the front yard is insufficient to accommodate a driveway. Table 515-1 shall not apply to property zoned PUD.

**Table 515-1**

| (A)<br>Zoning District or Use Pattern | (B)<br>Maximum Percent<br>of Front Yard |
|---|---|
| TND, TOD, MXD, D, IDZ | 30% |
| R-6, RM-6, R-5, RM-5, R-4, RM-4, R-3, MF-25, MF-33, MF-40, MF-50, NC | 50% |

(2)  In order to reduce impervious surfaces, shared driveways shall be permitted in any zoning district classification. In order to reduce runoff and increase stormwater travel times, alternative materials for driveway surfaces, such as pervious pavers or gravel, shall be permitted in any residential zoning district.

(3)  Table 515-1 shall not apply to irregular shaped lots as defined by subsection 35-516(I) of this chapter.

(4)  Driveways for single-family detached residential lots (R-4, R-5, R-6, and R-20), not fronting a collector or major thoroughfare, may be allowed two (2) driveways, not to exceed the impervious cover standards of Table 515-1, where the lot frontage is sixty (60) feet or greater.

(e)  **Zero Lot Line Subdivisions.**

(1)  **Maintenance Easement.** For zero lot line subdivisions, a minimum five-foot wide maintenance easement shall be provided through deed restrictions on the lot adjacent to the zero lot line. This easement shall be kept free of permanent obstructions such as tool sheds or fences without a gate. When filing an application for a building permit for a zero lot line development, the subdivider shall provide the city with two (2) copies of deed restrictions establishing the maintenance easements. One (1) copy of these deed restrictions shall be recorded by the applicant prior to issuance of the building permit. Along with the required building permit filing fees, an additional fee shall be provided by the subdivider to cover the recording costs of these deed restrictions.

(2)  **Plat Annotation.** The following notation shall appear on the plat:

"_____ foot wide maintenance easements are established within the lots adjacent to all non-attached zero lot lines. Such easements shall extend for the depth of the lot and are included in the deed restrictions for all affected properties."

(f)  **Townhouse Subdivisions.** For townhouse subdivisions, adequate provision shall be made by the subdivider for common ownership and maintenance of community facilities such as recreation and open space, parking, access and similar common use areas. Such open and service areas shall be described and so indicated on the subdivision plat. The description "townhouse subdivision" shall be prominently indicated on the subdivision plat. Also the plat shall include a statement designating all lots in the subdivision to be limited to townhouse use. The subdivider shall also furnish the city two (2) copies of deed restrictions limiting the property to townhouse use and providing disposition and maintenance covenants on all open space or other common ownership areas. Such restrictions shall be recorded by the applicant at the time of plat recordation. Along with the required plat filing fees, an additional fee shall be provided by the subdivider to cover county recording costs of such restrictive covenants.

(g)  **Two-Family Dwelling (Duplex) Lots.** A lot upon which there is located two (2) attached dwelling units may be subdivided or resubdivided through the common wall into separate fee simple lots for each dwelling unit subject to the following requirements. The two-family dwelling or duplex lot shall be vacated and replatted. Each single-family lot resulting from the subdivision shall have a minimum lot area of four thousand (4,000) square feet and shall be at least forty (40) feet wide except in the case of a planned unit development or planned residential development. Separate utility meters shall be provided to each newly created single-family lot. Separate water and wastewater service lines shall be provided to each newly created lot and

shall not traverse any other lot. Where common gas and electrical lines are provided to two (2) single-family lots, easements approved by CPS Energy shall be provided. Walls and floors separating dwelling units in the same building shall not be less than one-hour resistive construction.

(h)     **Flag Lots.**

(1)     Not more than the following number of flag lots may be authorized to allow for the more efficient use of irregularly shaped parcels of land, or where the integrated nature of multiple buildings on a site dictates the need for such lots. Flag lots may be used to better use irregularly shaped properties or sites with physical limitations. Flag lots shall not be permitted where they will increase the number of lots that take their access from collector or arterial streets. Table 310-1 and/or section 35-353 are superseded by the development standards of this section when applied to flag lots as follows:

**Table 515-2**
**Maximum Number of Flag Lots**

| Size of Subdivision | Maximum Number or Percentage (%) of Flag Lots |
| --- | --- |
| 10 or fewer lots | 2 lots |
| 11—50 | 20% |
| 51 or more | 20% |

(2)     The minimum driveway width shall be ten (10) feet.

(3)     Notwithstanding the provisions above, access to not more than four (4) lots may be provided by a shared driveway.

(4)     The minimum frontage at the right-of-way line for any flag lot shall be equal to the minimum required driveway width plus four (4) feet. The flag pole portion of the lot shall not be considered in determining the area of the lot.

(5)     On flag lots the maximum front setback line shall be measured from the nearest point at which the lot meets the minimum width (as required in Table 35-310-1) parallel to the street on which the lot fronts.



***Illustration of Typical Lots:***

Source: *The Latest Illustrated Book of Development Definitions*

   (i)     **Clear Vision Area.** See transportation standards, subsection 35-506(d)(5).

   (j)     **Transitional Standards.** Transitional buffer lot standards apply to some lower density zoning districts within the incorporated areas of the city. See subsection 35-310(d) of this chapter.

*(Ord. No. 98697 § 6) (Ord. No. 101816, § 2, 12-15-05) (Ord. No. 2006-11-30-1333, § 2, 11-30-06) (Ord. No. 2008-04-03-0267, § 2, 4-3-08) (Ord. No. 2009-01-15-0001, § 2, 1-15-09) (Ord. No. 2010-11-18-0985, § 2, 11-18-10)*

## Sec. 35-516. Setback and Frontage Regulations.

   (a)     **Front and Side Setbacks.** A subdivider may elect to impose more restrictive setbacks on a plat; however they must be enforced through restrictive covenants. The city shall only enforce the setbacks required by article III. The following shall be annotated on plats that exceed the building setback line requirements:

        "The setbacks imposed on this plat are at the discretion of the developer or Bexar County and are not subject to enforcement by the City of San Antonio."

   (b)     **Side Yard Building Line.** The building line for an existing residence having a side yard of three (3) or more feet may be maintained on any addition to the residence, but in no instance shall the side yard be less than three (3) feet. For regulations governing zero-lot line development, see subsection 35-373(c).

   (c)     **Yards Adjacent to Rights-of-Way and Easements.** On lots that abut a public alley, railroad right-of-way, or an utility/drainage right-of-way or easement which is not part of a platted lot, one-half (½) of such alley, right-of-way or easement, up to a maximum of fifteen (15) feet, may be considered as part of the minimum required rear or side yard.

   (d)     **Variation in Front Yard.** In any block in which seventy (70) percent of the lots have front yards that are less than required by the existing zoning, construction on any remaining vacant lots is permitted to the

average yard of the existing improved lots. In any block in which seventy (70) percent of the lots have front yards that are more than required by the existing zoning, construction on any remaining lot is permitted to the average yard of the existing improved lots.

(e)     **Rear Yards on Irregular Lots.** For lots fronting on culs-de-sac, eyebrows, or elbows, and other irregular shaped lots caused by street design, a rear yard of fifteen (15) feet is permitted based on the mean horizontal distance of the principal structure from the rear lot line and provided no part of the structure is closer than ten (10) feet to the lot line. The mean horizontal distance shall be calculated by adding the products of the width of each segment of the principal structure multiplied by its average distance from the property line and then dividing this sum by the total width of the structure.

(f)     **Dwelling on Small Lot.** See subsection 35-701(c), Nonconforming Lots of Record.

(g)     **Garages and Carports.** There shall be a minimum of twenty (20) feet between the back of a sidewalk or the property line and any garage entry accessed from a street right-of-way. The garage setback requirement for garages accessed from an alley shall be in accordance with section 35-370. Carports may be erected behind the minimum front setback required in the applicable zoning district, so long as twenty (20) feet of total parking area depth is maintained within the lot.

(h)     **Swimming Pools.** Swimming pools are prohibited within the front setback of all districts or within a platted or recorded utility or drainage easement. Pools which are excavated to a depth greater than three (3) feet below ground shall be located a minimum distance of five (5) feet from the side and rear lot lines.

(i)     **Reversed Corner Lots.** On reversed corner lots in all single-family residential zoning districts and on lots with single-family residential uses within the city and single-family subdivisions in the city's ETJ, the setback adjacent to the street shall be at least equal to the front setback required for the lot immediately adjacent to the rear. The provisions of this subsection shall not apply to planned unit developments (PUDs).

(j)     **Projecting Architectural Features.** Every part of a required yard shall be open and unobstructed from the ground to the sky except for permitted accessory structures and the ordinary projection of sills, belt courses, cornices, buttresses, eaves, and similar architectural features, provided that such projections shall extend neither more than five (5) feet into any required yard nor closer than three (3) feet to any property line.

(k)     **Reduction of Lot Size By Governmental Action.** Where the owner of a legally platted lot or his successor in title thereto has his lot reduced in size as a result of governmental action and thereafter does not own sufficient land to enable him to conform to the dimensional requirements of this chapter, such lot may be used as a building site for a single-family residence or other nonresidential uses permitted in the district in which the lot is located, provided that:

    (1)     In those cases where the lot area or mean lot width is reduced by governmental action not more than twenty (20) percent below the minimum specified in this chapter, the director of planning and development services shall issue a building permit or certificate of occupancy.

    (2)     In those cases where a vacant lot area or mean lot width is reduced by governmental action by more than twenty (20) percent, the director of planning and development services may approve, as a building site, such dimension as shall conform as closely as possible to the required dimensions of this chapter provided that the combined area of the main building and its accessory buildings shall not cover more than forty (40) percent of the lot area remaining after governmental action.

    (3)     In those cases where a structure is located on a legally platted lot and the existing yards are reduced by governmental action below the dimensional requirements specified in this chapter, the director of planning and development services shall issue a building permit or certificate of occupancy for alterations to and use of the existing structure if said structure and lot conformed to the required dimensional requirements prior to the lot reduction by governmental action.

    (4)     Items (1), (2) and (3) above shall also apply when a property has been reduced in size by means of a donation from the property owner in lieu of a condemnation on behalf of a publicly financed community improvement project if:

        A.     The donation is for the furtherance of a goal benefiting the community as a whole;

The donation does not benefit the property donor more than it does other property donors within the project area; and

C.       The subject property has been identified as a necessary part of a public project that has been reviewed by the planning commission, if required, and an ordinance has been passed by the San Antonio City Council directing the project to be completed and the subject property to be acquired.

(l)       **Setbacks Adjacent to High Pressure Fuel Lines, Railroads, or Thoroughfares.** A twenty-five-foot setback shall be shown on all lots adjacent to high pressure oil, gas or gasoline lines. The setback shall be measured at right angles from the center of the fuel line.

(m)      **Utility Lines.** Building setbacks adjacent to overhead utility lines shall comply with the provisions of section 35-506 of this article.

(n)      **Corner Lots.** Corner lots shall have sufficient width to provide appropriate building setback from and orientation to both streets as required by article III of this chapter.

(o)      **Previous Plats.** The setback line, as shown on plats initiated two (2) years prior to December 2, 2004, shall be recognized as the official setback line.

*(Ord. No. 95573 § 2, Amendment "C") (Ord. No. 98697 § 4 and 6) (Ord. No. 100126 § 2) (Ord. No. 101816, § 2, 12-15-05) (Ord. No. 2008-04-03-0267, § 2, 4-3-08) (Ord. No. 2009-01-15-0001, § 2, 1-15-09) (Ord. No. 2010-11-18-0985, § 2, 11-18-10)*

## Sec. 35-517. Building Height Regulations.

(a)      **Generally.** Building height shall conform to the requirements of section 35-310, Dimensional Matrix.

(b)      **Measurement.** Building height shall be measured as provided in the International Building Code.

(c)      **Height Exceptions.** The height limits for the various districts do not apply to church spires, belfries, cupolas, or domes not used for human habitation, nor to chimneys, ventilators, skylights, parapet walls, cornices, solar energy systems, or necessary mechanical appurtenances usually located on the roof level, provided that such features are limited to the height necessary for their proper functioning and do not exceed the limitations of the airport hazard zoning regulations.

(d)      **Setbacks for Height Increases.**

(1)       With the exception of residential uses located in single-family residential zoning districts, any portion of a structure in any zoning district may be erected to exceed the height limit established in section 35-310.01, Table 310-1, provided that such portion is located back from the side and rear setback lines one (1) foot for each two-foot of height in excess of the height limit prescribed in such section unless otherwise prescribed in subsections (2) and (3), below or through a specific use authorization and further provided the height does not exceed the limitations of the airport hazard zoning regulations. Distance credits shall be allowed for space occupied by structures of conforming height extending from the setback lines, except as specified in Table 310-1(k). The requirements of subsection (2) and (3) shall only apply to permits for new construction submitted after December 31, 2010.

(2)       The maximum height of any portion of a commercial, office or multi-family zoning district located within fifty (50) linear feet of the property line of an established single-family residential use shall be limited to the maximum height of the single-family district. The height limit shall not apply where a property is zoned single-family residential but not used for residential purposes, such as a church, school, park or golf course. The measurement of fifty (50) feet shall occur from the property line of the residential use to the structure in the zoning district subject to this subsection.

*For example, where a C-2 zoned property abuts single-family property with R-5 zoning, the C-2 property shall be limited in height to thirty-five (35) feet or two and one-half (2½) stories for that portion of the property within fifty (50) feet of the property line with the R-5 district.*

(3)       For portions of a zoning district subject to the height limit of subsection (2) the maximum height limit may be exceeded through the specific use authorization ("S") process.

*Illustration based on rear setback example:*



*(Ord. No. 2010-11-18-0985, § 2, 11-18-10)*

**Secs. 35-518 to 35-520. Reserved.**

*(Ord. No. 98697 § 6) (Ord. No. 2010-11-18-0985, § 2, 11-18-10)*

### Sec. 35-352. "DR" Development Reserve.

(a) **Purpose.** The purpose of the development reserve "DR" zoning district is to provide a temporary zoning classification for newly-annexed property. While use restrictions are imposed pursuant to the "DR" district:

  (1)     It is recognized that the annexed property may be compatible for a use permitted in any zoning district; and

  (2)     It is the policy of the city to rezone the property to an appropriate zoning classification as soon as practicable.

(b) **Development Restrictions Within "DR" Zoning Districts.**

  (1)     Uses permitted within a "DR" zoning district shall be the uses permitted in the "R-6" zoning district unless and until the property is rezoned to another zoning district.

  (2)     The development standards applicable to a "DR" zoning district shall be the those required within the "R-6" zoning district unless and until the property is rezoned to another zoning district.

### Sec. 35-353. "NP" Neighborhood Preservation Districts.

*STATEMENT OF PURPOSE*

*The neighborhood preservation districts are designed to protect properties zoned "R-A," "R-1a," "R-1b," or "R-1c" prior to June 4, 2001 and existing platted subdivisions which are substantially developed with single-family detached dwelling units. It is the policy of the city that these districts will be applied only to properties zoned "R-A," "R-1a," "R-1b," or "R-1c" prior to June 4, 2001 or platted subdivisions which are recorded as of the effective date of this chapter, in order to prevent such subdivisions from being further subdivided in a manner in order to avoid congestion in the streets, prevent safety hazards, protect the health and general welfare of subdivision residents, provide adequate light and air, prevent the overcrowding of land, avoid undue concentration of population, and facilitate the adequate provision of public facilities. The "NP" districts are not appropriate for the down zoning of unsubdivided parcels or tracts.*

(a) **Establishment.** The following "NP" districts are hereby established and referred to collectively herein as "NP" districts:

  "NP-8"
  "NP-10"
  "NP-15"

(b) **Permitted Uses.** The uses permitted within an "NP" district are the same as the uses permitted within an "R-6" district.

(c) **Dimensional Regulations.** The setback and height regulations for uses and structures within an "NP" district shall be as follows:

| (A) Zoning District | (B) Minimum Lot Size Conventional | (C) Maximum Density | (D) Minimum Frontage | (E) Minimum Lot Width | (F) Maximum Lot Width | (G) Maximum Building Height | (H) Minimum Front Setback | (I) Maximum Front Setback | (J) Minimum Side Setback | (K) Minimum Rear Setback |
|---|---|---|---|---|---|---|---|---|---|---|
| NP-15 | 15,000 | 3 | 55 | 75 | — | 35ft/2½ stories | 20 | — | 5 | 30 |
| NP-10 | 10,000 | 4 | 45 | 65 | — | 35ft/2½ stories | 20 | — | 5 | 20 |
| NP-8 | 8,000 | 5 | 40 | 60 | 150 | 35ft/2½ stories | 20 | — | 5 | 20 |

(d) **Nonconforming Lots.** The rezoning of an existing subdivision to an "NP" district may at times result in lots which do not conform to the new zoning district lot sizes. In such cases, a single-family detached dwelling, and any uses accessory thereto, shall be permitted as provided in subsection 35-702(c) of this chapter.

(e) **Properties Zoned Prior to June 4, 2001.** Properties zoned "R-A," "R-1a," "R-1b," or "R-1c" prior to June 4, 2001 whether platted or remaining undeveloped will be converted to new zoning districts as indicated in Appendix "D" - zoning district conversion matrix.

*(Ord. No. 95326 § 7 and 8) (Ord. No. 2009-01-15-0001, § 2, 1-15-09)*

## Sec. 35-354. "MH" Manufactured Housing District.

(a) **Purpose.** The "MH" districts are composed of areas suitable for manufactured homes and compatible uses. The districts are intended to provide suitable locations for HUD-Code manufactured homes on individual lots.

(b) **Permitted Uses.** The permitted uses within an "MH" district shall be those uses permitted in "RM-4" in Table 311-1 of this chapter.

(c) **Manufactured Homes on Individual Lots.**

(1) HUD-Code manufactured homes may be located on individual lots outside of a manufactured home park provided they are permanently installed and limited to one (1) home per lot. In addition they shall be subject to the following standards which are designed to ensure acceptable compatibility in exterior appearance between HUD-Code manufactured homes and site built dwellings that have been or may be constructed in adjacent or nearby locations.

(2) HUD-Code manufactured homes shall be permanently affixed to a foundation with a visible foundation system and skirting acceptably similar in appearance to foundations of site built residences. The foundation shall form a complete enclosure under exterior walls. Wheels and axles shall be removed. All units must also have covered front and rear entries, and site built steps and porches.

(3) Each HUD-Code manufactured home shall have a sloping roof with eave projections of at least six (6) inches, constructed with material generally acceptable for site built housing. The pitch of the main roof shall not be less than one (1) foot of rise for each four (4) feet of horizontal run.

(4) Any materials that are generally acceptable for site built housing may be used for exterior finish if applied in such a manner as to be similar in appearance, provided, however, that reflection from such exterior shall not be greater than from siding coated with clean, white, semi-gloss enamel paint.

(d) **Dimensional Regulations.** The dimensional regulations for an "MH" district are the same as those applicable to an "RM-4" district (see section 35-310 of this article).

*(Ord. No. 97568 § 2)*

## Sec. 35-355. "MHC" Manufactured Housing Conventional District.

(a) **Purpose.** The "MHC" districts are intended to provide suitable locations for HUD-Code manufactured homes in manufactured housing conventional subdivisions.

(b) **Permitted Uses.** The permitted uses within an "MHC" district shall be those uses permitted in an "RM-4" district, and manufactured homes and manufactured home parks.

(c) **Manufactured Homes Design and Installation Criteria.**

(1) HUD-Code manufactured homes shall be permanently installed and limited to one (1) home per lot. In addition they shall be subject to the following standards which are designed to ensure acceptable compatibility in exterior appearance between HUD-Code manufactured homes and site built dwellings that have been or may be constructed in adjacent or nearby locations.

(2) HUD-Code manufactured homes shall be permanently affixed to a foundation with a visible foundation system and skirting acceptably similar in appearance to foundations of site built

CIVIL PRACTICE AND REMEDIES CODE

TITLE 2. TRIAL, JUDGMENT, AND APPEAL

SUBTITLE C. JUDGMENTS

CHAPTER 37. DECLARATORY JUDGMENTS

Sec. 37.001.  DEFINITION.  In this chapter, "person" means an individual, partnership, joint-stock company, unincorporated association or society, or municipal or other corporation of any character.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 37.002.  SHORT TITLE, CONSTRUCTION, INTERPRETATION.  (a)  This chapter may be cited as the Uniform Declaratory Judgments Act.

(b)  This chapter is remedial;  its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations;  and it is to be liberally construed and administered.

(c)  This chapter shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it and to harmonize, as far as possible, with federal laws and regulations on the subject of declaratory judgments and decrees.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 37.003.  POWER OF COURTS TO RENDER JUDGMENT;  FORM AND EFFECT. (a)  A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed.  An action or proceeding is not open to objection on the ground that a declaratory judgment or decree is prayed for.

(b)  The declaration may be either affirmative or negative in form and effect, and the declaration has the force and effect of a final judgment or decree.

(c)  The enumerations in Sections 37.004 and 37.005 do not limit or restrict the exercise of the general powers conferred in this section in any proceeding in which declaratory relief is sought and a judgment or decree will terminate the controversy or remove an uncertainty.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.          *Chapter 37*
*1 of 4*

Sec. 37.004.   SUBJECT MATTER OF RELIEF.   (a)   A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

(b)   A contract may be construed either before or after there has been a breach.

(c)   Notwithstanding Section 22.001, Property Code, a person described by Subsection (a) may obtain a determination under this chapter when the sole issue concerning title to real property is the determination of the proper boundary line between adjoining properties.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.
Amended by:
    Acts 2007, 80th Leg., R.S., Ch. 305, Sec. 1, eff. June 15, 2007.


Sec. 37.005.   DECLARATIONS RELATING TO TRUST OR ESTATE.   A person interested as or through an executor or administrator, including an independent executor or administrator, a trustee, guardian, other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust in the administration of a trust or of the estate of a decedent, an infant, mentally incapacitated person, or insolvent may have a declaration of rights or legal relations in respect to the trust or estate:

(1)   to ascertain any class of creditors, devisees, legatees, heirs, next of kin, or others;

(2)   to direct the executors, administrators, or trustees to do or abstain from doing any particular act in their fiduciary capacity;

(3)   to determine any question arising in the administration of the trust or estate, including questions of construction of wills and other writings;   or

(4)   to determine rights or legal relations of an independent executor or independent administrator regarding fiduciary fees and the settling of accounts.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.  Amended by Acts 1987, 70th Leg., ch. 167, Sec. 3.08(a), eff. Sept. 1, 1987;  Acts 1999, 76th Leg., ch. 855, Sec. 10, eff. Sept. 1, 1999.

Sec. 37.0055.   DECLARATIONS RELATING TO LIABILITY FOR SALES AND USE TAXES OF ANOTHER STATE.   (a)   In this section, "state" includes any political subdivision of that state.

(b)   A district court has original jurisdiction of a proceeding seeking a declaratory judgment that involves:

(1)   a party seeking declaratory relief that is a business that is:

(A)   organized under the laws of this state or is otherwise owned by a resident of this state; or

(B)   a retailer registered with the comptroller under Section 151.106, Tax Code; and

(2)   a responding party that:

(A)   is an official of another state; and

(B)   asserts a claim that the party seeking declaratory relief is required to collect sales or use taxes for that state based on conduct of the business that occurs in whole or in part within this state.

(c)   A business described by Subsection (b)(1) is entitled to declaratory relief on the issue of whether the requirement of another state that the business collect and remit sales or use taxes to that state constitutes an undue burden on interstate commerce under Section 8, Article I, United States Constitution.

(d)   In determining whether to grant declaratory relief to a business under this section, a court shall consider:

(1)   the factual circumstances of the business's operations that give rise to the demand by the other state; and

(2)   the decisions of other courts interpreting Section 8, Article I, United States Constitution.

Added by Acts 2007, 80th Leg., R.S., Ch. 699, Sec. 1, eff. September 1, 2007.


Sec. 37.006.   PARTIES.   (a)   When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties.   A declaration does not prejudice the rights of a person not a party to the proceeding.

(b)   In any proceeding that involves the validity of a municipal ordinance or franchise, the municipality must be made a party and is entitled to be heard, and if the statute, ordinance, or franchise is alleged to be unconstitutional, the attorney general of the state must also

be served with a copy of the proceeding and is entitled to be heard.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 37.007.  JURY TRIAL.  If a proceeding under this chapter involves the determination of an issue of fact, the issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 37.008.  COURT REFUSAL TO RENDER.  The court may refuse to render or enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 37.009.  COSTS.  In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 37.010.  REVIEW.  All orders, judgments, and decrees under this chapter may be reviewed as other orders, judgments, and decrees.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.


Sec. 37.011.  SUPPLEMENTAL RELIEF.  Further relief based on a declaratory judgment or decree may be granted whenever necessary or proper.  The application must be by petition to a court having jurisdiction to grant the relief.  If the application is deemed sufficient, the court shall, on reasonable notice, require any adverse party whose rights have been adjudicated by the declaratory judgment or decree to show cause why further relief should not be granted forthwith.

Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.



In The

# Court of Appeals
### For The
## First District of Texas

---

## NO. 01-07-00578-CV

---

### LARRY E. POTTER, Appellant

### V.

### CLEAR CHANNEL OUTDOOR, INC., Appellee

---

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 2005-66527**

---

## MEMORANDUM OPINION

Appellant, Larry E. Potter, appeals a judgment rendered upon a motion for

summary judgment filed by appellee, Clear Channel Outdoor, Inc. ("Clear Channel"),

*last item in appendix*

in a dispute concerning the construction of lease agreements. We determine whether the trial court erred in granting Clear Channel's motion for traditional summary judgment and in denying Potter's motion for traditional summary judgment. We reverse the trial court's judgment in part, affirm the judgment in part, and remand this cause with instructions.

## Background

In 1997, National Advertising Company ("National"), a predecessor in interest to Clear Channel, and Potter executed 10 identical[1] ground leases, six of which are the subject of this appeal. The leases were for a 10-year term, with an effective starting date of August 1, 1995. Pursuant to each lease, National was permitted to erect billboard signs on tracts of land belonging to Potter in exchange for the greater of a fixed monthly rental or a percentage of the gross income that National derived from selling advertising space on the billboard signs. Under paragraph nine of each lease, "at the termination of the lease," National had a "right of first refusal" to continue to rent the land if Potter chose further to rent or to use his land for outdoor advertising. This right expired one month "after the lease expire[d]." Paragraph three of each lease also gave National, under certain conditions, the right to "terminate this lease" and provided Potter the option to purchase the entire sign structures and

---

[1] The leases differed only with regard to the tract of property affected.

2

permits from National "[i]n the event of such cancellation or in the event this lease is terminated for any reason and the parties have not executed a new lease or renewal of this Lease."

During the term of the leases, Clear Channel purchased six signs from a predecessor outdoor advertising company, and those six leases were assigned to Clear Channel.[2] Clear Channel did not succeed in contacting Potter regarding renewal of its leases before their expiration date of July 31, 2005. On August 1, 2005, Clear Channel sent the usual lease payments to Potter, but Potter returned the checks by a letter dated August 25, 2005, in which he noted that Clear Channel's leases had expired by their own terms on July 31, 2005, and that he was "declining to extend the ground leases for an additional one (1) year term on a holdover basis." On August 25, 2005, a representative of Clear Channel reached Potter, and they discussed renewing the leases. On August 29, 2005, Potter forwarded proposed renewal leases to Clear Channel, which Clear Channel received the following day. On September 1, 2005, Potter sent Clear Channel a letter informing Clear Channel that he intended to exercise his right to purchase the sign structures and permits, with the purchase price to be decided pursuant to the "terms of the ground lease."

---

[2] Three of the remaining leases were also the subject of litigation and of a separate appeal before this Court. *See Nat'l Adver. Co. v. Potter*, No. 01-06-01042-CV, 2008 WL 920338, at *1 (Tex. App.—Houston [1st Dist.] Apr. 3, 2008, pet. denied) (memo op.).

3

After receiving Potter's September 1 letter, Clear Channel's attorney sent a letter to Potter detailing Clear Channel's position that, because its leases had not "terminated, but rather [had] expired," paragraph three of the leases did not provide Potter the option to purchase the sign structures, and stating also that Clear Channel was declining Potter's offer to purchase the signs.[3] The letter also recited that Clear Channel was willing to continue discussions with Potter to execute new leases or to renew the prior leases, as had already been communicated to Potter on August 30, but that if a new lease agreement was not reached by October 20, 2005, Clear Channel would begin removing the sign structures. Clear Channel continued to attempt to

---

[3]   Paragraph three of the leases provided:

> 3. Lose [sic] of Use of Sign Structures. If at any time the highway view of [National's (later, Clear Channel's)] displays is obstructed or obscured, or the use or installation of such displays is prevented or restricted by law or by [National's (later, Clear Channel's)] inability to obtain or maintain any necessary permits or licenses, or if there occurs a diversion of traffic from, or a change in the direction of traffic on highways leading past [National's (later, Clear Channel's)] displays, [National (later, Clear Channel)] may, at its option, terminate this lease as to such specific location by giving 30 days written notice to [Potter]. In the event of such cancellation or in the event this lease is terminated for any reason and the parties have not executed a new lease or renewal of this Lease, [Potter] shall have the option to purchase the entire sign structure and permits from [National (later, Clear Channel)] for the then current market value of an installed fabricated structure, such value to be determined by the average of three (3) bids to be obtained from three (3) major sign fabricators.

4

negotiate renewal leases with Potter after this letter, but expressed to Potter that it had problems with the language of the proposed renewal leases, and suggested alternate terms.

On October 18, 2005, Potter filed suit against Clear Channel. Potter sought (1) a temporary restraining order, temporary injunction, and permanent injunction preventing Clear Channel from removing the billboards; (2) a judgment in the amount equal to the fair market value for the use of the billboards on his properties beyond the contractual period under the theory of quantum meruit; and (3) a declaratory judgment that Clear Channel had exercised its right of first refusal under paragraph nine by declining to accept the terms of Potter's proposed renewal leases and that Potter was therefore entitled to exercise his right to purchase the entire sign structures and permits from Clear Channel for the current market value of an installed fabricated structure. He also prayed for recovery of his attorney's fees and costs.

Clear Channel filed an answer that generally denied the allegations in Potter's petition, raised the affirmative defenses of waiver and ambiguity, and contained a counterclaim for declaratory judgment. In its counterclaim, Clear Channel sought declarations (1) that in order for the option to purchase under paragraph 3 to become effective, the lease must have "actually been terminated"; (2) that the leases had not terminated, but had expired; and (3) that therefore Potter did not have an option to

purchase the signs. It also sought to recover its attorney's fees and costs.

Potter filed a motion for traditional summary judgment on his declaratory judgment claim only; while that motion was still pending, Clear Channel filed its own motion for summary judgment that also addressed only the declaratory judgment claims. Neither motion addressed the quantum meruit claim in Potter's petition, and Clear Channel's motion did not address Potter's claim for attorney's fees and costs.[4]

Potter's motion for traditional summary judgment sought declarations that (1) Clear Channel had exercised its right of first refusal by rejecting Potter's proposed lease agreement and (2) Potter was entitled to exercise his option to purchase sign structures and permits from Clear Channel. As grounds for his motion, Potter argued that

(1)     Clear Channel's rejection of the terms of Potter's proposed renewal lease agreements was an exercise of its right of first refusal under paragraph nine of the leases and Clear Channel could no longer accept Potter's offer to extend the lease agreements and

(2)     Potter was entitled to exercise his right to purchase the entire sign structures and permits pursuant to the terms of paragraph three of the Leases, because such paragraph gave him the option to purchase "in the event [that the] lease [was] terminated for any reason and the parties [had] not executed a new lease or renewal of the lease." Potter asserted that because the leases had expired and there were no new leases or renewal of the prior leases

_____

[4]     Potter's injunctive relief requests were resolved by way of a rule 11 agreement between the parties.

6

between the parties, his option to purchase became effective.

In addition to a declaratory judgment in his favor, Potter sought recovery of his attorney's fees and costs.

In its motion for traditional summary judgment, Clear Channel also pursued a judicial declaration interpreting paragraph three of the leases. Clear Channel's motion did not specify whether Clear Channel was moving for summary judgment on its declaratory judgment counterclaim, or attempting to defeat Potter's declaratory judgment claim, or both, although language in the motion suggested the last.[5] As its grounds for the grant of its summary judgment, Clear Channel argued that

(1)   the Leases were not ambiguous and Potter had no effective option to purchase because the leases had "expired," rather than "terminated," and paragraph three provided Potter the option to purchase only upon the "termination" of the lease

(2)   alternatively, the leases were ambiguous and should be construed against Potter and the leases should be construed to mean that the option to purchase did not arise in the event of the expiration of the leases, but only on their termination; and

(3)   alternatively, Potter had waived any option to purchase because discussions continued between Potter and Clear Channel about possible renewal of the leases after Potter had attempted to exercise his option to purchase.

Clear Channel prayed that summary judgment be granted "on all grounds

_____

[5]   In a later filing, Clear Channel stated that "both sides have filed motions for summary judgment regarding their respective declarations."

7

stated" in the motion, that Potter "take nothing on his claim against Clear Channel," and that the court award Clear Channel its costs of court and reasonable attorney's fees. Clear Channel also prayed that, "if summary judgment for Clear Channel [was] not rendered as to all of Clear Channel's claims, or for all the relief requested," the trial court enter an order specifying the facts that were without substantial controversy.

On June 18, 2007, the trial court granted Clear Channel's motion for summary judgment and denied Potter's motion for summary judgment in an order that read:

> On this day came to be considered Plaintiff Larry E. Potter's Motion for Summary Judgment and Defendant Clear Channel Outdoor, Inc.'s Cross-Motion for Summary Judgment. The court, having considered the motion, pleadings, responses, and summary judgment evidence hereby DENIES Plaintiff's Motion for Summary Judgment and GRANTS Defendant's Cross-Motion for Summary Judgment.
>
> It is therefore ORDERED that Plaintiff's Motion for Summary Judgment is DENIED and Defendant's Cross-Motion for Summary Judgment is GRANTED.

On August 14, 2007, the trial court issued a final judgment, confirming the grant of Clear Channel's motion and the denial of Potter's motion, and denying Clear Channel's request for attorney's fees. The judgment read:

> By Order dated June 18, 2007, the Court denied Plaintiff Larry E. Potter's Motion for Summary Judgment and granted Defendant Clear Channel Outdoor, Inc.'s Cross-Motion for Summary Judgment. In doing so, the Court failed to address Clear Channel's request for an award of attorney's fees. Accordingly, it is

8

ORDERED that Defendant Clear Channel Outdoor, Inc.'s request for an award of attorney's fees is hereby denied.

This is a final and appealable judgment, which, in conjunction with the Court's order of June 18, 2007, disposes of all claims and parties in this cause.[6]

## Standard of Review

In two issues, Potter contends that the trial court erroneously granted Clear Channel's motion for summary judgment and erroneously denied his motion for summary judgment.

Both parties' motions sought summary judgments that would declare the

---

[6] Nothing in the record indicates that Potter's quantum meruit claim for the fair market value of the use of the billboards on his properties beyond the contractual period was ever presented to the court for resolution either by trial, summary judgment, or dismissal. However, the language of the "final" judgment" indicates that the judgment was meant to dispose of *all* claims and *all* parties, and it clearly expresses the trial court's intent that the judgment be final. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 200 (Tex. 2001) (holding that language of judgment can make judgment final, even though it should have been interlocutory, when intent to finally dispose of case is unequivocally expressed in words of judgment). "A judgment which grants more relief than a party is entitled to is subject to reversal, but is not, for that reason alone, interlocutory." *Id.* The judgment before us, therefore, is final, albeit subject to challenge as erroneous to the extent that it disposed of a claim without "an adequate basis for the rendition of judgment." *See id.* However, Potter does not complain on appeal, either by issue or argument, of the trial court's disposition of his quantum meruit claim. *See* TEX. R. APP. P. 38.1(i). Accordingly, we will affirm that portion of the judgment without regard to the merits. *See Garcia v. Nat'l Eligibility Express, Inc.*, 4 S.W.3d 887, 889 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (citing *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993)).

9

parties' rights pursuant to the declaratory judgment actions.[7] We review declaratory

judgments under the same standards as other judgments. *See* TEX. CIV. PRAC. & REM.

CODE ANN. § 37.010 (Vernon 2008). We look to the procedure used to resolve the

issue below to determine the standard of review on appeal. *City of Galveston v. Tex.*

*Gen. Land Office*, 196 S.W.3d 218, 221 (Tex. App.—Houston [1st Dist.] 2006, pet.

denied). When a trial court resolves a declaratory judgment action on competing

motions for summary judgment, "we review the propriety of the declaratory judgment

under the same standards that we apply in reviewing a summary judgment." *Id.*

We review a trial court's decision to grant or to deny a motion for summary

---

[7]   *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 37.001–.011 (Vernon 2008).

We note that the trial court's final judgment failed to actually declare any rights of the parties. In a declaratory judgment action, if a declaratory judgment would terminate the uncertainty or controversy giving rise to the lawsuit, the trial court is duty-bound to declare the rights of the parties as to the matters on which the parties join issue. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.008 (Vernon 2008); *Spawglass Constr. Corp. v. City of Houston*, 974 S.W.2d 876, 878 (Tex. App.—Houston [14th Dist.] 1998, pet. denied); *Calvert v. Employees Ret. Sys. of Tex.*, 648 S.W.2d 418, 419 (Tex. App.—Austin 1983, writ ref'd n.r.e.). The judgment in the case before us did not make any declarations regarding the matters for which declarations were sought by the parties. This was error. When a trial court errs by failing to declare the rights of the parties in its judgment, the appellate court may determine the rights of parties and render the judgment that the trial court should have rendered. *See Spawglass Constr.*, 974 S.W.2d at 879; *James v. Hitchcock Indep. Sch. Dist.*, 742 S.W.2d 701, 705 (Tex. App.—Houston [1st Dist.] 1987, writ denied); *Am. Eagle Ins. Co. v. Lemons*, 722 S.W.2d 229, 230 (Tex. App.—Amarillo 1986, no writ); *Calvert*, 648 S.W.2d at 421.

judgment de novo. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192, 199 (Tex. 2007) (citing rule for review of grant of summary judgment and reviewing denied cross-motion for summary judgment under same standard). Although a denial of summary judgment is not normally reviewable, we may review such a denial when both parties move for summary judgment and the trial court grants one motion and denies the other. *Id.* at 192. When the trial court's ruling granting one summary judgment motion necessarily denies another pending motion for summary judgment on the same issue, such as here, we imply the ruling of denial. *See Frank's Int'l, Inc. v. Smith Int'l, Inc.*, 249 S.W.3d 557, 559 n.2 (Tex. App.—Houston [1st Dist.] 2008, no pet.). In our review of such cross-motions, we review the summary judgment evidence presented by each party, determine all questions presented, and render the judgment that the trial court should have rendered. *Tex. Mun. Power Agency*, 253 S.W.3d at 192 (citing *Comm'rs Court v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997)).

Under the traditional summary judgment standard, the movant has the burden to show that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co., Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). In deciding whether there is a disputed material fact issue precluding summary judgment, evidence favorable to the non-movant will be

11

taken as true, and every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Nixon*, 690 S.W.2d at 548–49. A defendant moving for summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). If the order granting the summary judgment does not specify the grounds upon which judgment was rendered, we must affirm the summary judgment if any of the grounds in the summary judgment motion is meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

## Clear Channel's Motion for Summary Judgment

Potter's first issue complains of the trial court's grant of Clear Channel's motion for summary judgment. Potter challenges all three of Clear Channel's grounds for summary judgment, arguing that the trial court incorrectly interpreted the leases and that he did not waive his right to exercise his option to purchase.

### A. Construction of the Leases

Clear Channel's first two grounds for summary judgment related to the construction of the leases and specifically to the question of whether the phrase,

> . . . [i]n the event of such cancellation or in the event this lease is terminated for any reason and the parties have not executed a new lease or renewal of this Lease, [Potter] shall have the option to purchase the entire sign structure and permits from [National (later, Clear Channel)]

12

. . .

that is contained in paragraph three of the leases provided Potter an option to purchase the sign structures and permits when the lease terms expired. Clear Channel argued that the word "terminated" did not include the *expiration* of a lease. Potter argued that the phrase "terminated for any other reason" included the expiration of the leases at the end of their natural terms.

We construe a lease under the well-established rules of contract construction. *See Luccia v. Ross*, 274 S.W.3d 140, 146 (Tex. App.—Houston [1st Dist.] 2008, pet. denied). In construing a written contract, the primary concern is to ascertain and to give effect to the parties' intentions as expressed in the document. *Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005). We consider the entire writing and attempt to harmonize and to give effect to all of the provisions of the contract by analyzing the provisions with reference to the whole agreement. *Id.* at 312. No single provision is given controlling effect. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "In harmonizing these provisions, terms stated earlier in an agreement must be favored over subsequent terms." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). We construe contracts "from a utilitarian standpoint bearing in mind the particular business activity sought to be served" and "will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly v. Rangers Mgmt.*,

13

*Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous, and we construe it as a matter of law. *Id.*

Both parties agree that the leases had expired, and that the parties had not executed new leases or a renewal of the leases, when Potter informed Clear Channel that he was exercising his option to purchase the sign structures and permits under the terms of the leases. Both parties assert that paragraph three of the leases, pertaining to such option to purchase, is unambiguous, although they construe the provision differently.[8]

We agree that the disputed language is unambiguous and so determined recently in another appeal before us involving three additional leases between Potter and National, containing identical language and executed on the same day as the leases at issue in this appeal.[9] In *National Advertising Co. v. Potter*, we decided that language identical to that before us in this appeal provided Potter the option to purchase sign structures and permits when the leases expired at the end of their natural terms. *See* No. 01-06-01042-CV, 2008 WL 920338, at *5–7 (Tex.

---

[8]    The mere fact that parties may disagree about the construction of a contract provision does not render it ambiguous. *See Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 727 (Tex. 1981).

[9]    Apart from the particular tract of property affected by each lease, the leases in *National Advertising* were identical to those before us.

14

App.—Houston [1st Dist.] Apr. 3, 2008, pet. denied) (memo op.). We held that the leases were not ambiguous and that the word "terminate," as used in the leases, included the expiration of the lease term. *Id.* at *6–7. In so holding, we explained that

> [e]xamining paragraph three and giving its terms their generally accepted meaning, it is clear that the parties intended that, in the event that a specific sign or location became useless by the occurrence of one of various specified situations, National was granted the right to immediately terminate its Lease of the specific location. Paragraph three grants Potter the option to purchase the sign structures and permits from National, "[i]n the event of *such cancellation.*" (Emphasis added.)
>
> However, paragraph three contemplates a second situation in which Potter is granted the option to purchase the signs and permits from National: "in the event this lease is terminated for any reason *and the parties have not executed a new lease or renewal of this Lease.*" Paragraph three also governs in the event that the Leases are terminated "for *any* reason" and the parties do not execute a new lease or a "renewal." Use of the term "renewal" naturally contemplates an expiration. That the parties could have intended the circumstance in which one party prematurely terminates the Lease and then "renews" it is not a reasonable interpretation. Hence, the parties must have intended "terminated," as used within the Leases, to include expiration . . . . The term[] "terminated". . . include[s] the expiration of the Leases on their natural terms . . . .

*Id.*

Clear Channel contends that there are material differences between *National Advertising* and this cause and cites to different evidence before the trial court in the motions for summary judgment at issue and the fact that, in *National Advertising*, the parties presented an agreed statement of facts and filed an agreed motion for

15

judgment based on the agreed facts. Clear Channel argues that extrinsic evidence presented to the trial court in this cause—evidence related to the negotiations in the original signing of the leases in 1997 and to the attempts to renew the leases in 2005—supports upholding the trial court's ruling, even though such ruling implicitly construes the contract contrary to our interpretation of the same language in *National Advertising*. Clear Channel further argues that it is proper for us to consider the "circumstances surrounding the execution of an unambiguous contract" when interpreting that contract, citing to *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515 (Tex. 1968).

Clear Channel has misconstrued the holding of *Pinehurst*. A reviewing court may consider the surrounding circumstances[10] present at the time that the contract was entered into in order to determine whether the contract is ambiguous, but, once a reviewing court decides that a contact is unambiguous, extrinsic evidence may be not be utilized to determine the parties' intent. *See Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520–22 (Tex. 1995); *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 731–32 (Tex. 1981). Because we have determined that the language at issue is unambiguous, we do not consider the proffered extrinsic

---

[10] For example, extrinsic evidence of the "trade usage" meaning of a term within a particular industry may be considered in determining whether that term has a definite or certain legal meaning for the purpose of the contract. *See Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 n.6 (Tex. 1995).

16

evidence in interpreting the unambiguous language of the leases at issue.[11]

After reviewing the summary judgment motions and responses in this case, and the accompanying evidence to the extent that it may be considered, we determine that our previous interpretation of the same language, in identical leases, signed by the same parties, on the same day, should govern our interpretation of the leases before us in this appeal. We conclude, for the reasons set out in our opinion in *National Advertising*, that paragraph three of the leases is not ambiguous and declare that, under its terms, Potter had an option to purchase the entire sign structure and permit which was the subject of each lease upon the expiration of the lease term.

## B. Waiver

Clear Channel's final ground for summary judgment was its affirmative defense that, if Potter had an effective option to purchase, he had waived that option because discussions continued between Potter and Clear Channel about possible renewal of the leases after the date that the leases expired and after the date on which Potter had attempted to exercise his option to purchase. As evidence for this ground, Clear Channel cited its own attempts to contact Potter in order to renew the leases, Potter's August 29 forwarding of proposed renewal leases in response to Clear

---

[11]    We note, however, that the circumstances surrounding both the leases at issue in *National Advertising,* and those in the present case, were exactly the same because both sets of contracts were executed between the same parties on the same day under the same circumstances.

17

Channel's overture to Potter on August 25, and a September 30 email from a representative of Clear Channel to Potter, in which the representative mentioned speaking to Potter and proposed certain terms for renewal of the leases.

"The affirmative defense of waiver can be asserted against a party who intentionally relinquishes a known right or engages in intentional conduct inconsistent with claiming that right." *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996). In order to be entitled to a summary judgment on waiver, Clear Channel had to establish conclusively each element of this affirmative defense. *See Sci. Spectrum*, 941 S.W.2d at 911. Therefore, Clear Channel was required to establish conclusively that Potter had either (1) expressly waived his option to purchase or (2) engaged in conduct inconsistent with his option to purchase. *See Tenneco*, 925 S.W.2d at 643.

Clear Channel did not do so. There is no evidence in the record that Potter expressly waived his option to purchase, and the evidence offered on this matter does not conclusively establish an implied intent on the part of Potter to waive his option to purchase. "Waiver is largely a matter of intent, and for implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances." *Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003). In order to establish waiver by conduct, the conduct must be "unequivocally inconsistent" with claiming a known right. *Van Indep. Sch. Dist. v. McCarty*, 165

18

S.W.3d 351, 353 (Tex. 2005). The evidence on summary judgment does not conclusively establish that Potter engaged in "clear, unequivocal, and decisive acts" evidencing the intention to waive his option to purchase. *See Estes v. Wilson*, 682 S.W.2d 711, 714 (Tex. App.—Fort Worth 1984, writ ref'd n.r.e.) ("It is an established rule of law that to prove an implied waiver of a legal right, there must be a clear, unequivocal and decisive act of a party showing a purpose or acts which amount to estoppel on his part."). We hold that Clear Channel did not meet its burden to be entitled to summary judgment on the affirmative defense of waiver.[12]

## C. Resolution

Having concluded that, under the unambiguous language of paragraph three of the leases, Potter had an option to purchase the entire sign structure and permit that was the subject of each lease upon the expiration of the lease term, and, having determined that Clear Channel did not conclusively establish that Potter waived his option to purchase the sign structures and permits, we hold that Clear Channel was not entitled to the summary judgment requested. We sustain Potter's first issue.

### Potter's Motion for Summary Judgment

In his second issue, Potter asserts that the trial court erred in denying his motion for summary judgment. As previously detailed, in his summary judgment

---

[12] Neither Potter nor Clear Channel sought a declaratory judgment on the question of waiver and so we make no declaration on this matter.

19

motion, Potter sought two declarations from the trial court: (1) that Clear Channel had exercised its right of first refusal by rejecting Potter's proposed lease agreement and (2) that Potter was entitled to exercise his option to purchase sign structures and permits from Clear Channel. He also sought attorney's fees.

We have already determined that the leases provided Potter an option to purchase the sign structures and permits upon the expiration of the leases, and, therefore, we hold that Potter was entitled to summary judgment declaring that he had such an option. Our resolution of Potter's other question in his declaratory judgment action—whether Clear Channel had exercised its right of first refusal—is likewise guided by our opinion in *National Advertising*. In that case, when deciding whether National had exercised its right of first refusal under an identical paragraph nine as in the leases before us, we stated, "Here, National declined to renew the Leases on the terms offered by Potter in his August 25, 2005 correspondence. Hence, National exercised its right of first refusal when it rejected Potter's offer." *Nat'l Adver.*, 2008 WL 920338, at *4. For the same reasons stated in that opinion, we declare that Clear Channel exercised its right of first refusal when it declined to renew the leases under the terms offered by Potter to Clear Channel in the letter mailed on August 29, 2005.

However, as to the issue of attorney's fees, Potter's summary judgment sought recovery of his attorney's fees and costs for both the declaratory judgment claim and

20

his quantum meruit claim,[13] and the evidence provided to the trial court did not distinguish between fees related to each distinct claim.[14] Potter may not recover attorney's fees and costs for the quantum meruit claim on which he did not prevail or recover damages. *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). Additionally, any "award [of] costs and reasonable and necessary attorney's fees as are equitable and just" in a declaratory judgment action is within the discretion of the trial court. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 2008).

The trial court presumably did not award attorney's fees or costs to Potter because it denied his motion for summary judgment on his declaratory judgment claim. Because we have reversed the trial court's denial of Potter's summary

---

[13] Potter's summary judgment motion specified that he was seeking attorney's fees and costs "pursuant to TEX. CIV. PRAC. & REM. CODE § 37.001 et. seq. and [*sic*] TEX. BUS. & COMM. CODE § 38.011, et. seq." The first reference is clearly seeking recovery for attorney's fees related to his declaratory judgment action. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 2008) (permitting trial court to award "costs and reasonable and necessary attorney's fees as are equitable and just" in action for declaratory judgment). The second seems to be an attempt to recover attorney's fees related to the quantum meruit claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001 (Vernon 2008) (permitting recovery for attorney's fees and costs for variety of claims, including claims as to rendered services, performed labor, furnished material, or oral or written contract).

[14] *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006) (reaffirming rule that if any attorney's fees relate solely to claim for which fees are unrecoverable, claimant must segregate recoverable fees from unrecoverable fees, and holding that remand required when fees not segregated and at least some of attorney's fees are attributable only to claims for which fees are not recoverable).

21

judgment, because we have declared in his favor the issues before the trial court for declaratory judgment, and because any award for costs and reasonable and necessary attorney's fees "as are equitable and just" in a declaratory judgment action is discretionary, we conclude that cause should be remand to the trial court for it to consider the issue of Potter's attorney's fees and costs on his declaratory judgment.

We sustain Potter's second issue.

## Conclusion

We reverse the trial court's judgment in part, affirm the judgment in part, and remand this cause with instructions. We reverse the judgment to the extent that it rendered summary judgment for Clear Channel and implicitly granted a declaratory judgment for Clear Channel. We affirm the judgment to the extent that it implicitly rendered a take-nothing judgment against Potter on his quantum meruit claim. We remand this cause to the trial court with instructions to render a declaratory judgment in favor of Potter consistent with this opinion and to consider Potter's request for the award of attorney's fees and costs under Texas Civil Practice and Remedies Code section 37.009. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

Tim Taft
Justice

22

Panel consists of Chief Justice Radack and Justices Sharp and Taft.[15]

---

[15] The Honorable Tim Taft, retired justice, Court of Appeals for the First District of Texas, participating by assignment.